# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

JENNINE LOUISE OAKLEY,      §
§
     *Plaintiff,*      §
§
*versus*      §      CIVIL ACTION NO. 3:13-679
§
CAROLYN W. COLVIN,      §
Acting Commissioner of      §
Social Security,      §
§
     *Defendant.*      §

## REPORT AND RECOMMENDATION

Jennine Louise Oakley ("Oakley") seeks review of an adverse decision on her applications for disability-based benefits under the Social Security Act.

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). When reviewing acts of administrative agencies, courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II.  Background

Oakley completed high school and four years of college, receiving a degree in Social Sciences.  She worked as a nurse's assistant, food service worker, mail clerk, document preparer, and case aide.  (T. 38-39).  While working in food service in July, 2006, Oakley slipped and fell at work on a wet floor.  Her right foot was injured when it became wedged under a dishwasher.  (T. 543).  After elevating and icing it for several days, she sought treatment at Chenango Bridge Medical Center, and was assessed with a right ankle *sprain*.  (*Id*.).  At that time, Oakley's weight was reported as 325 pounds at 5'5" in height.  (*Id*.).

Oakley returned to work; however, pain persisted.  A magnetic resonance image ("MRI") revealed a *fractured* ankle with degenerative osteoarthritis of her right ankle and subtalar joint.  (T. 297).  Oakley underwent physical therapy for three months and used an ankle/foot orthosis; however, neither helped much.  (T. 294, 297).  She participated in pain management counseling.  (T. 425-39).  Ultimately, subtalar fusion surgery was recommended for pain relief.  (T. 362).

Oakley also suffers from diabetes and arthritis in her left ankle, as well.  (T. 303).  She experiences constant and chronic pain.  Weight loss has been recommended, and while her weight fluctuates some, it has remained 300-plus pounds.  She uses a prescribed cane to ambulate every day even for short distances; she has a walker when absolutely needed.  (T. 86-87).  She no longer drives because her right ankle lacks stability, and she cannot drive wearing a brace.  (T. 93).  She can only stand for a few minutes at a time.  She also claims that she must elevate her right leg while sitting.  (T. 85-86).

Oakley became depressed over her inability to function in a meaningful manner, and developed anxiety about returning to work. (T. 339). Several treating sources diagnosed Oakley with depressive disorder aggravated by stress. (T. 404, 595, 600-07). She was prescribed Paxil, and participated in outpatient counseling in fall 2007. (T. 226). Oakley took additional prescription medications (Buspar and Hydroxzine) to help with mood swings, depression and anxiety. (T. 88). She met with a social worker at Binghamton Internal Medicine, and had an appointment for mental health services at Broome County Mental Health Association scheduled after the evidentiary hearing. (*Id.*).

## III. Claim

In July, 2007, Oakley filed a social security claim alleging disability commencing July, 2006, due to a "fractured ankle with posttraumatic tibiotalar and subtalar arthritis, anxiety, depression, [and] diabe[tes]." (T. 216). After her claim was denied initially, she requested and received an evidentiary hearing before an administrative law judge, Richard West ("ALJ West"), who denied Oakley's application in June 2009. (T. 54-69, 105-126). In January 2011, the Appeals Council vacated ALJ West's decision and remanded the matter to another administrative law judge with instructions to obtain additional medical evidence, reevaluate treating source opinions, and use a vocational expert to clarify effect of Oakley's limitations on her occupational base. (T. 130-32).

Upon remand, her applications were assigned to a new administrative law judge, Edward I. Pitts ("ALJ Pitts"), who conducted a second evidentiary hearing. (T. 70-104). Oakley was represented by, a non-attorney representative (paralegal). (T. 23). ALJ Pitts received into evidence (a) testimony from Oakley and vocational expert, David A. Festa ("VE Festa"), (b) forensic reports from

treating, examining and nonexamining (reviewing) sources, and (c) Oakley's medical treatment records. (T. 23-41, 70-104).

ALJ Pitts denied Oakley's application in a written decision dated July 19, 2011. (T. 23-41). Oakley filed a request to review with the Appeals Council. (T. 18-19). The Appeals Council denied Oakley's request for review. (T. 1-6). Oakley then instituted this proceeding.

## IV. Commissioner's Decision[1]

ALJ Pitts found that Oakley suffers from severe impairments consisting of "residuals following right ankle fracture, type 2 diabetes mellitus, and morbid obesity." (T. 26). He further found that these impairments diminish Oakley's ability to engage in work-related activities such that her current residual functional capacity is for work only at the sedentary exertional level, further reduced by numerous nonexertional limitations.[2] (T. 30-31).

---

[1]    ALJ Pitts utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. The Commissioner's five-step process is described fully in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[2]    ALJ Pitts's full residual functional capacity finding was:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the exertional demands of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with additional non-exertional limitations. Specifically, the claimant can occasionally lift, carry, push or pull 10 pounds; can frequently lift, carry, push or pull less than 10 pounds; can stand or walk, in combination, for 2 hours in an 8-hour workday with normal breaks; must use an assistive device to ambulate, even on a flat and level surface; can sit for 6 hours in an 8-hour workday with normal breaks; has no limitations in using her upper extremities; can occasionally climb stairs; cannot climb ladders; must avoid working at unprotected heights or around moving machinery; and must avoid exposure to temperature extremes or vibration.

(T. 30-31).

VE Festa testified that Oakley would be capable of performing her prior case-aide work as actually performed. ALJ Pitts, however, found that, Oakley is unable to perform any of her past relevant work. VE Festa further opined that other available jobs exist that a person with Oakley's residual functional capacity can perform. (T. 40). He identified unskilled, sedentary occupations of charge account clerk, addresser, and lens inserter. (T. 40, 97-98).

Based on VE Festa's testimony, ALJ Pitts concluded that Oakley can make a successful adjustment to other work existing in significant numbers in the national economy. Further, ALJ Pitts concluded that a finding of "not disabled" was appropriate under the "framework" of Medical-Vocational Rule 202.28.[3] (T. 40). Oakley's applications, therefore, were denied. (T. 41).

## V. Points of Alleged Error

Oakley's brief presents four points of error, as follows:

1. ALJ improperly failed to find depression as a severe condition and improperly failed to consider the effect that the depression would have upon Plaintiff's ability to work;

2. The ALJ violated the treating physician rule;

3. Vocational testimony was not substantial because the hypothetical used by ALJ was improper; and

4. ALJ did not properly determine credibility.

(Dkt. No. 21, pp. 10-22).

---

[3]     *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Medical-Vocational Guidelines are a matrix of general findings – established by rule – as to whether work exists in the national economy that a person can perform. They "take into account a claimant's residual functional capacity, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (summary order) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).

# VI. Step 2 Severity Determination

Existence and severity of "impairments" are determined at Step 2 of the sequential evaluation process (described earlier in note 1).[4] "Severe impairments" significantly limit an individual's physical or mental ability to do basic work activities.[5] In this Circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . .'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987)).

## A. Nonseverity Finding

ALJ Pitts agreed that Oakley has some severe impairments (listed above in Section IV), but he declined to find others, including depression, as severe impairments.[6] Regarding depression and anxiety-related disorders, ALJ Pitts

---

[4] "Impairments" are "anatomical, physiological, or psychological abnormalities . . . demonstrable by medically acceptable clinical and laboratory techniques." *See* 42 U.S.C. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D); 20 C.F.R. §§ 404.1508, 416.908.

[5] The Commissioner's regulation defines "basic work activities" as "abilities and aptitudes necessary to do most jobs," examples of which include:

> (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).

[6] Impairments other than depression and anxiety-related disorders that ALJ Pitts found to be non-severe were hypertension, hyperlipidemia, history of kidney stones and left ankle disorder. (T. 26-27).

applied a "special technique" for evaluating severity of mental disorders (described *infra*), and then concluded:

> The claimant's allegations of . . . depression, and anxiety-related disorders are not considered severe impairments because the medical evidence establishes that these conditions, whether singly or in combination with other impairments, are only slight abnormalities and would have no more than a minimal effect on the claimant's ability to perform work. . . .

(T. 26-27) (citations omitted). When making this finding, ALJ Pitts *rejected* professional medical source opinion that Oakley is *moderately* limited (*i.e.*, greater than minimally) by her mental impairments. ALJ Pitts reasoned that (a) primary care providers "prescribed relatively low-dose antidepressants . . .with noted improvement in her symptoms within a short period of starting her medication;" (b) Oakley was not engaged in mental health treatment, and had only received outpatient mental health counseling as part of pain management treatment for a short period of time; (c) Oakley has no prior history of emergency department, outpatient or inpatient psychiatric treatment; (d) Psychosocial testing revealed "few clinical signs or findings for complaints of panic attacks and post-traumatic stress disorder;" (e) Oakley's "difficulties in performing her daily activities and socializing with others are largely related to . . . physical pain, rather than significant psychiatric symptoms;" and (f) Oakley's "difficulties getting along with others secondary to irritability and anger appear to occur in limited circumstances." (T. 28).

B.    *Oakley's Challenges*

Oakley complains that ALJ Pitts erred in failing to find that her depression constitutes a severe condition. (Dkt. No. 21, pp. 10-13). First, Oakley argues that in the initial administrative decision, ALJ West found Oakley's depression to be severe, and further found that this impairment reduced her

residual functional capacity to "only simple and repetitive jobs." (T. 56-57). Oakley asserts that the Appeals Council did not question this finding, and nothing in the evidentiary record changed. Consequently, a contrary finding was not warranted upon remand. (Dkt. No. 21, p. 13 n.4).

Oakley further argues that, contrary to ALJ Pitts's impression that Oakley's depression and anxiety disorders are only *slight* abnormalities, primary-providers' clinical records indicate that she has *high levels* of anxiety and *severe levels* of depression. To buttress this argument, Oakley points specifically to (a) numerous treating-source diagnoses of depression and prescribed anti-depressant medications; (b) an assessment by Dr. Angela Crawford, Ph.D., that Oakley exhibits high levels of emotional distress, severe tension, excessive worry and repressed mood; and (c) similar notations from other treatment providers.[7]

Finally, Oakley emphasizes that both forensic consulting medical sources (Dr. Dennis M. Noia, Ph.D. and Dr. A. Hochberg, Ph.D.) found after examination (by Dr. Noia) and review of the longitudinal medical record (by Dr. Hochberg) that Oakley's mental impairments produce moderate *functional* limitations that would have greater than minimal effect on her ability to work. Therefore, Oakley argues that "[p]laintiff's depression/anxiety is not de minimis; they significantly affect her ability to work and, therefore, they should have been considered severe." (Dkt. No. 21, p. 11).

---

[7]     Dr. John Prindle, M.D. (T. 339)(noting "very depressed" and awaiting results of psychological evaluation); primary care physician Dr. Marta Anghel, M.D. (T. 404)(diagnosing depressive disorder; changed medication from Paxil to Wellbutrin to help with mood); nurse practitioner Ryan Little, N.P. (T. 595, 600-07)(diagnosing depressive disorder, moderate-severe, aggravated by stress; experiencing anxiety and weird dreams as side effect of medication).

*C.      Governing Principles*

When *mental* impairments are at issue, the sequential Step 2 severity determination is made through application of a "special technique" set out in 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e); *see also Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (describing analysis). This complex and abstruse technique, cited and applied by ALJ Pitts, helps administrative law judges determine at Step 2 of sequential evaluation whether claimants have medically determinable mental impairments and whether such impairments are severe.[8] Under this technique*, functional effects* of mental impairments are factored. To complete a severity assessment, this technique requires an administrative law judge to "rate the degree of functional limitation" in four areas: (1) "[a]ctivities of daily living;" (2) "social functioning;" (3) "concentration, persistence, or pace;" and (4) "episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). For the first three functional areas, an administrative judge provides a rating of either "[n]one, mild, moderate, marked, [or] extreme." *Id.*, at §§ 404.1520a(c)(4), 416.920a(c)(4). For the fourth category (episodes of decompensation) an administrative judge provides a rating on a five-point scale: "[n]one, one or two, three, four or more." *Id.* Administrative law judges generally conclude that claimants' mental impairments are not severe when they receive ratings of "none" or "mild" in each of the first three areas and "none" in the fourth area. *Id.*, at §§ 404.1520a(d)(1), 416.920a(d)(1); *Kohler*, 546 F.3d at 266.

---

[8]      Under this technique, an administrative law judge "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [those] findings." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Next, the administrative law judge must assess the degree to which the claimant's impairment functionally limits his or her "ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*, at §§ 404.1520a(c)(2), 416.920a(c)(2).

*D.    Application*

When finding Oakley's depression to be a non-severe impairment, ALJ Pitts reasoned:

> Because the claimant's medically determinable mental impairment causes no more than "mild" limitations in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are non-severe.

(T. 27).  The Commissioner argues that ALJ Pitts's "decision contains a careful and thorough discussion of Plaintiff's depression, and substantial evidence supports his [non-severity] finding."  (Dkt. No. 17, p. 6).

There was, indeed, a careful and thorough discussion of Oakley's depression.  ALJ Pitts's ultimate finding, however, is at odds with the medical record, and his reasons for rejecting professional medical opinion are unsound. At Southern Tier Pain Management Center, a battery of psychological testing, administered and summarized by Dr. Crawford demonstrates that Oakley suffers from "high levels of emotional distress, including depression, anxiety and anger . . . . The results of [tests] . . . indicate[] relatively high levels of depression and anxiety . . . . (T. 427).  Indeed, the Beck Depression Inventory ("BDI") identified Oakley as "a person who is experiencing a severe level of depression." (T. 435).  Oakley was found to be a "positive clinical case."  *Id*.  Her depression score "is significantly above average for pain patients.  Only 5% of pain patients . . . scored at this level or higher."  (T. 437).  Similarly, Oakley scored considerably above average in anxiety, which suggests "serious levels of anxiety and associated symptoms."  (T. 438).

Additionally, many of Oakley's treating providers noted depression, and/or diagnosed her with depression.[9]  At the hearing, Oakley testified to being prescribed several anti-depressant medications, "Buspar, Paxil, and Hydroxzine for depression and anxiety." (T. 88).  She further testified to having met with a social worker in Binghampton, and to recently having received  mental health services at Broome County Mental Health Association.  (*Id*.).

Dr. Noia, a consultative psychological examiner, diagnosed Oakley with Depressive Disorder. (T. 310-13).  In a medical source statement, Dr. Noia found Oakley to be mentally capable of understanding and following only simple instructions and directions.  (T. 313).  He assessed that Oakley can relate to and interact with others only moderately well, and noted further that Oakley "appears to be having some difficulty dealing with stress."  (*Id*.).

Dr. A. Hochberg, a non-examining State Agency medical review psychological consultant,[10] reviewed Oakley's longitudinal record of mental health treatment.   Dr. Hochberg also opined that Oakley has *moderate* functional limitations with regard to maintaining concentration, persistence, or pace. (T. 328).  In a "Mental Residual Functional Capacity Assessment" form,[11] Dr. Hochberg found Oakley to be moderately limited in the following activities:

- ability to understand and remember detailed instructions;
- ability to carry out detailed instructions;

---

[9]     *See*, *supra*, at Section II.

[10]     The record indicates his area of specialty as "Psychology." (T. 318).  Moreover, under the Commissioner's regulations and practices, the Psychiatric Review Technique form completed by Dr. Hochberg must be signed by either a psychologist or psychiatrist.  *See* POMS DI 24505.025.F.4, Evaluation of Mental Impairments, *available at* http://policy.ssa.gov/poms.nsf/lnx/0424505025 (last visited December 1, 2014); *see also* 20 C.F.R. §§ 404.1520a(e)(1), 404.1615(c)(1) (disability determinations made by a medical or psychological consultant

[11]     Mental Residual Functional Capacity Assessment, Form SSA-4734-BK-SUP.

- ability to maintain attention and concentration for extended periods; and

- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

(T. 332-33).

In sum, both mental health professionals who issued forensic opinions regarding Oakley's mental status concluded that Oakley has *moderate*, *i.e.*, greater than minimal *functional* limitations emanating from her depression.

ALJ Pitts rejected consulting mental health professional opinion and found Oakley's treatment records insufficient to show more than minimal effect on ability to work because "there is little evidence of medication or treatment," there have been "few clinical signs or findings," and she has no history of inpatient psychiatric hospitalizations. (T. 28). This reasoning might be persuasive were it employed at sequential Step 3 (where the inquiry is not whether a claimant's mental impairment crosses a *de minimis* threshold, but rather whether it meets or medically equals a listing of *presumptively disabling* mental impairments). But, when employed to determine whether an impairment crosses the low *de minimis* threshold, it is weak. At Step 2, it is not necessary to find one's impairment so incapacitating as to require hospitalization before it qualifies as a severe impairment. *See Hooper v. Astrue*, 733 F. Supp.2d 721, 723 (E.D.N.C. 2010). When mental impairments are at issue, moreover, failure to obtain treatment is not dispositive or necessarily probative. *See DeLeon v. Secretary of Health & Human Servs.*, 734 F.2d 930, 934 (2d Cir. 1984). Finally, as set forth, *supra*, the record reflects ample clinical signs and findings of depression (Dr. Crawford's testing and diagnoses and medication for treatment by primary care providers).

Ultimately, ALJ Pitts substituted her own judgment for that of competent medical opinion on the issue of severity of Oakley's mental impairment(s). Absent a good reason for rejecting that evidence, ALJ Pitts erred. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." ) (internal citations omitted).

E.    *Harmless Error Analysis*

Congressional mandates requiring courts to review administrative decrees in light of "the rule of prejudicial error" and to disregard all administrative errors and defects not affecting "substantial rights" refer to what modern jurisprudence calls "harmless error doctrine." *See Shinseki v. Sanders*, 556 U.S. 396, 406-08 (2009). Under this doctrine, a reviewing court must reverse and remand when an administrative law judge errs unless, as a matter of law, the result was not affected by the error. *See NLRB v. Enterprise Assoc.*, 429 U.S. 507, 522 n. 9 (1977). In other words, administrative legal error is harmless when the same result would have been reached had the error not occurred. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

Traditional harmless-error analysis is supplemented by a specialized variant dealing with Step 2 severity errors in social security proceedings. Several courts both within and outside the Second Circuit reason that when an administrative law judge identifies *some* severe impairments at Step 2, and then proceeds through sequential evaluation on the basis of combined effects of *all* impairments, including those erroneously found to be non severe, an error in failing to identify all severe impairments at Step 2 is harmless. *See Stanton v. Astrue*, 370 Fed. App'x 231, 233 n.1 (2d Cir. 2010) (noting, in *dicta*, that there

was no error by ALJ in finding disc herniation non-severe because ALJ did identify other severe claims at Step 2 so that claim proceeded though the sequential evaluation process and all impairments were considered in combination).[12] Conceptually, it is eminently reasonable to conclude that an early error is harmless when it is negated before a final decision. Such occurs when *functional effects* of impairments erroneously determined to be non-severe at Step 2 are, nonetheless, fully considered and factored into subsequent residual functional capacity assessments. In those instances, reviewing courts usually can conclude that the same result would have been reached absent the error.

When assessing residual functional capacity, administrative law judges must consider all of the relevant medical and other evidence, and *all* impairments, *i.e.*, both severe and nonsevere, must be factored into residual functional capacity determinations.[13] Here, there is no discernible basis for concluding that ALJ Pitts factored Oakley's depression or its functional effects into his ultimate residual functional capacity determination. (T. 30-31). Oakley's depression or other mental impairments were not mentioned again after the Step 2 severity determination. ALJ Pitts did not include any nonexertional mental limitations in his articulation of Oakley's residual

_____

[12]    *See also Warren v. Astrue*, No. 10-CV-500S, 2012 WL 32971, at *4 (W.D.N.Y. Jan. 6, 2012) (despite ALJ's "lack of clarity" at step two, ALJ properly considered all the effects of all Plaintiff's impairments, making remand inappropriate); *Briggs v. Astrue*, No. 09-CV-1422 (FJS/VEB), 2011 WL 2669476, at *4 (N.D.N.Y. Mar. 4, 2011) (when ALJ concluded that Plaintiff had an impairment considered severe under the Act. . .and continued with the sequential analysis, any arguable error in his findings. . .at step two of the analysis was harmless); *McCartney v. Commissioner of Soc. Sec.*, Civil Action No. 07-1572, 2009 WL 1323578, at *16 (W.D.Pa. May 8, 2009) ("Even if. . .ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments.").

[13]    *See* 20 C.F.R. §§ 404.1520(e)and 1545; SSR 96-8ᴘ, 1996 WL 374184, at *5.

functional capacity. When asking VE Festa to identify alternative, available work that Oakley might still perform, ALJ Pitts did not include in his hypothetical question any limitation to account for depression or other mental deficit. A reviewing court, therefore, cannot declare the error harmless under this issue-specific test.

Traditional harmless-error analysis, however, provides a clear answer. Had ALJ Pitts found Oakley's depression or other mental impairment to be severe, or had ALJ Pitts nevertheless factored its limitations into his residual functional capacity assessment, he almost certainly would have restricted Oakley to performance of unskilled work.[14] That limitation, then, would have been included in any hypothetical question posed to VE Festa. But, since all jobs identified by VE Festa as alternative work that Oakley can still perform are classified as *unskilled*,[15] a reviewing court confidently can conclude that VE Festa would have given the same testimony had he been asked to factor in a mental limitation that restricts Oakley to unskilled sedentary work. This, in turn, permits a reviewing court to determine that ALJ Pitts would have come to the same decision absent his Step 2 severity error. As such, the error is harmless.

---

[14] The State agency reviewing psychologist, A. Hochberg, specifically found that Oakley is "capable of meeting the demands of unskilled work on a sustained basis." (T. 334).

Dr. Noia's medical source statement tracks the Commissioner's articulation of basic mental demands of competitive, remunerative, unskilled work (expressed in SSR 85-15, Titles II and XVI: Capability To Do Other Work—The Medical-Vocational Rules as A Framework For Evaluating Solely Nonexertional Impairments, 1985 WL 56857, at *4 (SSA 1985). (T. 313).

[15] VE Festa identified the following unskilled, sedentary jobs: charge account clerk, addresser, and lens inserter. (T. 97-98).

# VII. Physical Residual Functional Capacity

Oakley's second and fourth points of error (relating, respectively, to weighting of medical evidence and subjective testimony) both seek to impugn ALJ Pitts's assessment of Oakley's *physical* "residual functional capacity."[16] Point Two principally argues that ALJ Pitts violated the "treating physician rule" (discussed *infra*) when he declined to give controlling weight to forensic opinions expressed by a treating podiatrist regarding Oakley's exertional and nonexertional limitations with respect to basic work-related activities. Point Four argues that ALJ Pitts used legally-unsound reasoning when rejecting Oakley's subjective self-assessments of the intensity, persistence and limiting effects of her symptoms. Oakley urges the court to conclude that, as a result of these errors, ALJ Pitts's residual functional capacity finding is flawed because it "fails to take into account the full extent of Plaintiff's limitations resulting from her ankle impairment." (Dkt. No. 21, p. 16). Specifically, Oakley argues that ALJ Pitts "failed to include the full extent of serious restrictions on Plaintiff's ability to lift, carry, balance, stoop, crouch, kneel, crawl, or use her feet more than occasionally." (*Id.*)

---

[16] "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis.

When assessing residual functional capacity, administrative law judges identify and evaluate a claimant's limitations relating to specific physical and mental functions that correspond with ordinary work activities. These functions include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling and other physical functions, and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors. *See* 20 C.F.R. §§ 404.1545, 416.945; SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *1, 5-6 (SSA July 2, 1996).

*A.    Medical Evidence Relating to Ankle Impairment*

At the time of the evidentiary hearing, Oakley's most recent medical treatment for physical ailments relating to her ankle impairment was provided by a podiatrist, Dr. Joseph T. Hogan, DPM.[17] On May 23, 2011, Dr. Hogan completed and submitted a "Medical Assessment of Ability to do Work-Related Activities (Physical)" wherein he opined that Oakley can never lift/carry ; can sit for 8 hours without interruption; can stand for 1 hour without interruption for a total of 2 hours in an 8-hour workday; cannot walk without interruption for a total of 2 hours in an 8-hour workday; can use both hands for simple grasping and fine manipulation; can occasionally use both feet; can occasionally reach, handle, feel, push, and pull and continuously hear and speak; can never climb, balance, stoop, crouch, kneel, or crawl; cannot tolerate heights or moving machinery but can tolerate chemicals, noise, and humidity; and cannot tolerate exposure to extreme temperatures and vibrations but can tolerate dust and fumes. (T. 635-38).

*B.    ALJ Pitts's Weighting of Dr. Hogan's Opinion*

When assessing Oakley's physical residual functional capacity, ALJ Pitts *accepted* Dr. Hogan's "restrictions involving climbing stairs or ladders, working at heights or around moving machinery, and exposure to temperature extremes or vibration. . .." (T. 37).  He *rejected* Dr. Hogan's "greater limitations," (lifting, sitting for prolonged periods, postural activities).  ALJ Pitts considered those limitations as "not supported by the record. . .." (*Id.*).

ALJ Pitts devoted considerable space to articulating reasons for giving only little or limited weight to Dr. Hogan's more restrictive assessments of

---

[17]    Podiatrists are "acceptable medical sources" qualified to establish medically-determinable impairment(s). 20 C.F.R. §§ 404.1513(a)(4), 416.913(a)(4).

exertional and nonexertional (postural) limitations.  With respect to lifting, ALJ Pitts discredited Dr. Hogan's assessment because Oakley was seen by primary care and orthopedic providers on multiple occasions when she "failed to allege any problems with lifting weight. . .."  (T. 37).  ALJ Pitts found the absence of references to muscle atrophy in evidence from treating or examining sources as indicating "that the claimant does not suffer from the types of disuse generally associated with severe limitations of functioning." (*Id*.).  ALJ Pitts considered normal vascular and neurologic findings in Dr. Hogan's progress notes as impugning his clinical findings of instability and swelling of Oakley's ankle.  (T. 38).  ALJ Pitts considered Oakley's daily activities as involving "significant postural or manipulative activities. . .." (*Id*.).  ALJ Pitts discounted Dr. Hogan's opinion because he "only began treating the claimant since August 13, 2010, more than 4 years after her initial injury; and his opinion appears to be based primarily on the claimant's self reports of symptoms and functional limitations . . .." (*Id*.).  Finally, ALJ Pitts mentioned that Oakley saw Dr. Hogan "only on five occasions between August 2010 and April 2011." (T. 32).  Ultimately, ALJ Pitts concluded:

> [M]edical opinions of the examining physicians, Drs. Sheikh, Graham and Kochersperger, and the treating orthopedic surgeons, Drs. Kim and Scerpella, are entitled to greater weight than Dr. Hogan's opinion because . . . [their] finding[s] that the claimant has significant exertional capacities are more consistent with the record in its entirety.

(T. 38).  (This supposedly contrary evidence is examined in Section VII.*D, infra*.)

*C.*    *Treating Physician Rule*

The familiar "treating physician rule," described in the note below,[18] embodies a presumption that, in the presence of conflicting medical evidence, opinions of treating sources will be given controlling weight. The Commissioner articulates the rationale for this rule as follows:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

This administrative presumption is rebuttable. Thus, when treating source opinion swims upstream, contradicting other substantial evidence, such as opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643–44 (2d Cir. 2007) (summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Treating-source opinion may be discounted when it is internally inconsistent. *See Micheli v. Astrue*, 501 Fed. App'x 26, 28 (2d Cir. 2012) (summary order).

---

[18]    Administrative law judges must give controlling weight to opinions of treating sources regarding the nature and severity of impairments, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). When controlling weight is not afforded to treating source opinion, or when other medical source opinion is evaluated with respect to severity of impairments and how they affect individuals' ability to function, the degree of weight to be given such evidence is determined by applying certain generic factors: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent opinion is with record as a whole; (5) specialization in contrast to condition being treated; and (6) other significant factors. 20 C.F.R. §§ 404.1527(c), 416.927.

A corollary to the treating physician rule is the so-called "good reasons rule," which provides that the Social Security Administration "will always give good reasons in [its] notice of determination or decision for the weight [it] give[s] [claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96–2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). Courts embrace this requirement. *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific ....'" *Blakely v. Commissioner of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting SSR 96–2p, 1996 WL 374188, at *5).

Because the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process," *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Blakely*, 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243; emphasis in *Blakely*).

As delineated in note 18, *supra*, the Commissioner prescribes a six-factor analysis whereby administrative law judges can decide *how much* weight to afford treating source opinion when they decline to give it *controlling* weight. Courts conducting judicial review in social security cases, however, do not require perfect opinions or rigid, mechanical, formulaic applications of this test. *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) ("no such slavish recitation of each and every factor [20 C.F.R. §§ 404.1527(c),

416.927(c)] [is required] where the ALJ's reasoning and adherence to the regulation are clear"); *see also Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed"). In some instances, for example, an evidentiary record may be silent with respect to a prescribed analytical factor, such that addressing that factor would be superfluous. In sum, reviewing courts are more concerned with whether an administrative decision reflects that the entire record was considered, whether substance of a prescribed analytical protocol was traversed, whether the reasons underlying findings are expressed clearly enough for meaningful judicial review, and whether determinations are supported by substantial evidence. *See, e.g., Cichocki v. Astrue*, 729 F.3d 172, 177–78 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to provide a prescribed function-by-function analysis of residual functional capacity is grounds for remand).[19]

D.   *Discussion*

Oakley's contention that ALJ Pitts failed to engage in the prescribed six-factor analysis before deciding to give Dr. Hogan's opinions little or limited weight (instead of controlling weight) is well-taken. A reviewing court, however, cannot conclude that ALJ Pitts, when eschewing that precise form of analysis, actually traversed the *substance* of this prescribed analytical protocol. ALJ Pitts's method of determining credibility of treating physician opinion substantially adhered to the regulation. ALJ Pitts's reasoning that Dr. Hogan's

---

[19]    *See also, Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) and *Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) (both declining to view a 7-factor analysis prescribed by regulation for assessing subjective credibility as a rigid prerequisite).

opinions were not well supported and inconsistent with other substantial evidence precisely fit within regulatory Factor 4 (how consistent opinion is with record as a whole). His impression that Dr. Hogan's assessment regarding Oakley's severely-limited ability to walk or stand were unsupported by his treatment notes relates directly to Factor 3 (evidence supporting opinion). ALJ Pitts's reasoning that Oakley's activities of daily living involve significant postural or manipulative activities relates to Factor 6 (other significant factors). Thus, substantive adherence to the governing regulation is apparent, and ALJ Pitts's mere failure to explicitly apply the applicable six factors *seriatim* does not equate to a reversible error for failure to apply correct principles of law.

Whether ALJ Pitt's reasons are plausible and supported by substantial evidence is quite another matter. His principal reason (recited twice in the decision) for rejecting Dr. Hogan's opinions regarding limitations emanating from Oakley's ankle impairment was that those opinions are unsupported by the medical evidence as a whole and are inconsistent with other substantial evidence. This assertion is demonstrably inaccurate. *All* of the objective medical evidence confirms presence of a severe ankle impairment, and treating, independent examining and consulting physicians uniformly assessed significant limitations as a result of Oakley's ankle impairment.[20] If anything, the other medical evidence overwhelmingly is *consistent* with Dr. Hogan's opinions.

None of the other medical sources, except consultative internal medicine examiner, Dr. Jamshid Sheikh, M.D., and a non-examining State agency medical consultant (Dr. L. Virella, M.D.), even purported to assess Oakley's limitations with respect to the various physical-function components of residual functional

---

[20]     An unchallenged summary of the medical evidence regarding Oakley's severe and limiting ankle impairment is contained in plaintiff's brief. (Dkt. No. 21, pp. 2-7, 14-16.)

capacity. Treating orthopedists and independent medical examiners in the workers' compensation case did not, as ALJ Pitts implies, opine that Oakley has "significant exertional capacities" greater than expressed by Dr. Hogan.[21]

Neither treating sources nor independent medical examiners (for workers' compensation purposes) were asked or had any obvious reason to opine specifically with respect to Oakley's capacity for engaging in the ordinary

---

[21] Dr. David R. Graham, an orthopedist who performed an independent orthopedic medical evaluation for workers' compensation, noted that Oakley can only be on her feet for a few minutes at a time. (T. 302). She cannot walk any distance. (T. 302-03). He further noted that she cannot go up and down stairs. (T. 303). Dr. Graham opined that Oakley will require surgery on her right ankle and if she is left the way she is "she will never return to work and will continue to require supplemental income." (Id.).

Dr. Kyung I. Kim, M.D., an orthopedic surgeon, examined Oakley, observing slight eversion of the subtalar joint. (T. 296). Over the next several months and after obtaining CT scans and MRI, Dr. Kim opined that Oakley had advanced degenerative osteoarthritis of the ankle joint along with subtalar joint. (T. 294-96). He determined that Oakley is able to stand and walk about 10-15 minutes with the air ankle splint. (T. 295). He opined that Oakley could not go back to standing job because of her arthritis along with her weight. (T. 295).

Dr. L. Virella, M.D., a nonexamining State agency medical consultant, completed a Physical Residual Functional Capacity Assessment, opining Oakley could lift and/or carry less than 10 pounds occasionally and frequently; stand and/or walk for less than 2 hours in an 8-hour workday; sit less than 6 hours in an 8-hour workday; her ability to push/pull is limited in upper and lower extremities; can never climb (ramps, stairs, ladders, ropes, or scaffolds); and can only occasionally balance, stoop, kneel, crouch, or crawl. (T. 377-78). He opined that "the preponderance of evidence in file substantiate an RFC for less than sedentary." (T. 377).

Dr. Patrick R. Scerpella, M.D., an orthopedic surgeon, examined Oakley to provide a second opinion regarding her right ankle pain. (T. 362-65). He recommended subtalar fusion surgery for pain relief. (T. 362). He explained, however, that even with successful surgery, he was "not overly optimistic about her prognosis." (T. 365).

Dr. Albert B. Kochersperger, M.D., an orthopedist who performed an independent medical evaluation for workers' compensation, observed an obviously antalgic gait. (T. 372-74). She had a limited range of motion in her right foot. (T. 373). Dr. Kochersperger opined that Oakley had reached maximum medical improvement and that her condition is permanent. (T. 374). He found there is a "permanent partial disability at a marked level. (Id.).

Dr. Marta Anghel, M.D., Oakley's primary care physician, noted Oakley's persistent pain in her right ankle. (T. 532). She further observed that her injury is aggravated by climbing stairs, movements, descending stairs, walking, and standing with associated symptoms including decreased mobility, spasms, tenderness, sleeplessness. (Id.).

physical functions that administrative law judges consider when assessing physical residual functional capacity in social security cases.[22] Yet, ALJ Pitts improperly conflated *absence* of such opinions as evidence of *contrary* opinions. ALJ Pitts's conclusion that Dr. Hogan's opinions were unsupported by the record as a whole and contrary to other substantial evidence was patently unreasonable.

ALJ Pitts chose to accord "great weight" to the opinion of consultative examiner, Dr. Jamshid Sheikh, M.D. because it is "supported by the objective laboratory and clinical evidence." (T. 34). Dr. Sheikh's opinions were, indeed, inconsistent with Dr. Hogan's opinions in several respects.[23] State agency medical consultants such as Dr. Sheikh are considered highly qualified experts in Social Security disability evaluation. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Their opinions can override treating source opinions, but not in a vacuum. There must be a good reason beyond than the consultant offers a

---

[22] Absent a request for forensic opinions, treating medical sources' clinical notes focus on diagnoses and treatment modalities. They typically do not delve into patients' specific physical capacities to lift, carry, sit, stand, walk, stoop, climb, *etc.*

Although entitled to some weight and should be considered, independent medical examiners in workers' compensation cases express forensic opinions regarding workers' abilities to engage in the precise jobs in which they were employed at the time of sustaining a work-related illness or injury. *See Roller v. Colvin*, No. 5:12-cv-01680 (TJM), 2014 WL 1280849, at *17 (N.D.N.Y. Mar. 27, 2014) (citing New York Workers' Compensation Law § 10, *et seq.*, and 20 C.F.R. § 404.1504). Gratuitous commentary regarding workers' ability to return to "light duty" or even "sedentary work" do not correspond with various exertional categories of work at issue in social security residual functional capacity assessments.

[23] In September 2007, Dr. Sheikh observed during an internal medicine examination that Oakley's gait was abnormal and she was unable to walk on heels and toes due to right foot pain. (T. 315). He opined that although she had a prescription for a cane, he did not believe it was medically necessary. (*Id.*). He assessed that Oakley has mild to moderate restrictions in ability to walk extending [sic] distances or stand for long periods of time due to right foot pain. He noted "[n]o other limitations were seen on exam." (T. 317).

contradictory "medical opinion." *See Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir.1995).

Here, ALJ Pitts's stated reason lacks foundation. As determined above, ALJ Pitts interpreted *absence* of evidence from other treating and examining medical sources regarding Oakley's capacity for engaging in specific work-related physical functions as *contrary or inconsistent* evidence. Such conflation was an impermissible inference.

The record before ALJ Pitts suggested no other obvious reason to give greater weight to Dr. Sheikh's assessments. Dr, Sheikh saw Oakley only once, several years before the evidentiary hearing before ALJ Pitts, whereas, Dr. Hogan has an ongoing treatment relationship with Oakley. Dr. Sheikh's opinion dated September, 2007, is stale compared to the most recent physician assessment by Dr. Hogan in 2011. Dr. Sheikh practices internal medicine; whereas, Dr. Hogan is a specialist in the field of podiatry who assessed Oakley's right ankle impairment, a matter directly related to his expertise.

ALJ Pitts's remaining reasons for rejecting Dr. Hogan's opinions were either patently illogical or makeweight at best. It was nonsensical to discount Dr. Hogan's opinions – the most recent available – simply because his treatment relationship began four years after the initial ankle injury, or because his opinions were based in part on Oakley's subjective history. *See Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (referring to "a patient's report of complaints, or history, as an essential diagnostic tool"); *accord Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). It was manifestly illogical to impugn Dr. Hogan's opinions because he treated Oakley on only five occasions while simultaneously electing to give greater weight to the opinions of a consultative examining physician (Dr. Sheikh) – who saw Oakley only once – without having a good reason to do so. Neither Oakley's silence regarding lifting when being

treated or examined in connection with her workers' compensation proceeding, nor the fact that she attributed driving difficulty to her ankle brace rather than inability to sit impugns Dr. Hogan's professional opinions formed after clinical observation and treatment. ALJ Pitts's lay opinion that Oakley should exhibit muscle atrophy due to disuse if she were as functionally limited as opined by Dr. Hogan is lay speculation, and even if correct, it does not account for difficulties treating and medical sources inevitably would have encountered in detecting muscle atrophy in a morbidly obese patient. Finally, the fact that Oakley's daily activities reflects that she sometimes lifts, carries, sits, stands and engages in postural activities necessary for basic life activities does not meaningfully degrade Dr. Hogan's opinions as to her exertional and postural limitations for engaging in workplace activities on a regular and continuing basis. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *see also Stoesser v. Commissioner of Soc. Sec.*, No. 08–CV–643 (GLS/VEB), 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011).

In sum, ALJ Pitts violated the "treating physician rule" by failing to provide good cause, supported by substantial evidence, for not giving controlling weight to Dr. Hogan's opinions regarding Oakley's ankle-related exertional and nonexertional limitations.

E.    *Harmless Error Analysis*

This error was not harmless. It deprived Oakley of a substantial right *implicitly* guaranteed under the Constitution[24] and *expressly* granted under the

---

[24]    The Constitution condemns arbitrary and capricious exercise of government power, and, for over a century, American jurisprudence has recognized that administrative facts not fairly supported by evidence are arbitrary and baseless. *Interstate Commerce Comm'n v. Louisville & Nashville R.R. Co.*, 227 U.S. 88 (1913); *see also Rice v. Shalala*, No. 93-1305, 1 F.3d 1234 (Table), 1993 WL 309631, at *5 n. 6 (4th Cir. Aug. 16, 1993) (acknowledging that substantive due process rights are implicated by argument suggesting that Commissioner's decision was not supported by substantial evidence).

Administrative Procedure Act and the Social Security Act to a decision supported by substantial evidence.[25] Here, moreover, specific and pragmatic reasons preclude a conclusion that the same result would have occurred absent the error identified in the preceding section. Unless Dr. Hogan's opinion regarding *exertional* limitations is rejected for good reason, Oakley's physical residual functional capacity will be reduced to less-than-sedentary.[26] Unless Dr. Hogan's opinion regarding Oakley's postural limitation against all stooping is rejected for good cause, a finding of complete erosion of her remaining occupational base is a near certainty.[27]

Simply stated, until the nature and extent of Hawley's exertional and nonexertional limitations are fully assessed and articulated in a valid physical residual functional capacity finding, a reviewing court cannot confidently conclude that substantial evidence would support findings that Hawley can perform the alternative, available work that VE Festa stated Oakley can still do.

## VIII. Remaining Arguments and Point of Error

Since remand is necessary based on the error identified above, it is unnecessary to address Oakley's remaining residual functional capacity argument relating to ALJ Pitts's weighting of her subjective testimony (Point 4), or the additional point of error (Point 3) which contends that VE Festa's testimony did not rise to the level of substantial evidence. Although these issues

---

[25] *See* 5 U.S.C. § 706(d); 42 U.S.C. § 405(g).

[26] In the Social Security context, a person must be able to lift ten pounds occasionally to be capable of "sedentary work." *Carvey v. Astrue*, 380 Fed. App'x 50, 52 (2d Cir. 2010) (summary order); *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a).

[27] "A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply . . .." *See* SSR 96-9p, Titles II and XVI: Determining Capability to do Other Work-Implications of a Residual Functional Capacity for Less Than Sedentary Work, 1996 WL 374185, at *8 (SSA July 2, 1996) (emphasis in original).

are not analyzed or adjudicated here, the Commissioner should consider them when making a new determination.

## IX. Conclusion and Recommendation

There may be ample and valid reasons for rejecting Oakley's treating podiatrist's opinions regarding her exertional and nonexertional limitations. The reasons employed by ALJ Pitts in this case, however, were not valid. Accordingly, the Commissioner's decision should be REVERSED, and the case REMANDED pursuant to 42 U.S.C. § 405(g), sentence four.

## X. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___8___ day of ___December___ 2014.

_Earl S. Hines_

Earl S. Hines
United States Magistrate Judge